## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AVA ASSESSMENT ASSOCIATES, INC., | ) |
| | ) No. 2:23-cv-01529-RJC |
| Plaintiff, | ) |
| | ) |
| v. | ) Judge Robert J. Colville |
| | ) |
| PDA INTERNATIONAL, INC., HS GROUP | ) |
| SOCIEDAD DE RESPONSIBILIDAD | ) |
| LIMITADA, NICHOLAS STOCKER, and | ) |
| ANDRES RORMESER, | ) |
| | ) |
| Defendants. | ) |

## <u>MEMORANDUM OPINION</u>

Robert J. Colville, United States District Judge

Before the Court are the following motions: a Motion to Vacate Entry of Default (ECF No. 31) filed by Defendant, Nicholas Stocker; a Motion to Compel Arbitration (ECF No. 43) and a Motion to Dismiss (ECF No. 46) filed by Defendants, HS Group Sociedad de Responsibilidad Limitada and Andres Rormeser[1]; and a Motion to Dismiss (ECF No. 70) and a Motion to Compel Arbitration (ECF No. 71) filed by Defendant, PDA International, Inc. The Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over any state-law claims pursuant to 28 U.S.C. § 1367. The Motion have been fully briefed and are ripe for disposition.

---

[1] The Complaint spells Defendant's last name as "Rormeser." However, in the Motions to Compel Arbitration and to Dismiss, Defendant spells his last name as "Rormoser." Neither party has directly addressed this discrepancy or clarified the correct spelling of Defendant's name. Therefore, the Court will refer to Defendant as he is named in the Complaint.

## I.    Factual Background & Procedural History

In the Complaint, Plaintiff sets forth the following factual allegations relevant to the Court's consideration of the Motions at issue:

Plaintiff owns the AVA Behavioral Assessment System, an industrial human resource tool, "that renders detailed profiles of individuals, identifying their natural tendencies and predicting their workplace behaviors." Compl. ¶¶ 18, 22. Additionally, Plaintiff developed, and owns, "a fully web-based implementation of the AVA Behavior Assessment System, known as "WEBAVA" and, together with the AVA Behavior Assessment System, the "AVA IP." *Id.* ¶ 24. Plaintiff licenses the AVA IP to customers across the World, including the United States. *Id.* ¶ 25.

On September 1, 2005, Plaintiff's predecessor, WVC, entered into a License Agreement with Defendant Stocker and Leonardo Lammers[2], individually and doing business as HS. Id. ¶ 29. Plaintiff alleges that HS is the predecessor to Defendant HS Group. *Id.* ¶ 30. As part of this License Agreement, HS was given an exclusive license to market and use certain trade secrets, including the WVC System, the predecessor to the AVA Behavioral Assessment System. *Id.* ¶ 31-33. In turn, HS agreed to undertake efforts to maintain and protect the secrecy of any trade secrets and confidential information. *Id.* ¶¶ 34. Further, as part of this agreement, HS agreed to pay WVC twenty percent of the Gross Revenue generated by HS "'in connection with the sale, license, marketing, or use' of the WVC System, its products, and its services." *Id.* ¶ 36 (quoting Ex. A).

On October 10, 2007, Bizet, a successor in interest to WVC and a predecessor to Plaintiff, notified HS of its intent to terminate the License Agreement effective April 8, 2008. *Id.* ¶ 39. In its letter, Bizet also provided that HS was in breach of the License Agreement and that the License

---

[2] On May 13, 2025, Plaintiff filed a notice of voluntary dismissal, without prejudice, as to Lammers dismissing him as a defendant in this matter. ECF No. 67.

Agreement "precluded the assignment of any rights under that agreement, or the sharing or dividing of any duties, without Bizet's express written consent." *Id.* ¶ 41.  On October 25, 2007, HS, by letter signed by Lammers, Stocker, and Defendant Rormeser, acknowledged that it was in possession of WVC's confidential products and did not oppose the termination of the License Agreement notwithstanding the dispute as to any potential breach of the Agreement.  *Id.* ¶ 42.  A second letter was then sent by Bizet emphasizing that the License Agreement prohibited HS from duplicating or combining Plaintiff's trade secrets.  *Id.* ¶¶ 45-46.  The License Agreement was terminated on April 8, 2008.  *Id.* ¶ 47.

Plaintiff alleges that in or around 2008, Lammers, Stocker, and Rormeser founded and began doing business as Defendant PDA International, Inc.  *Id.* ¶ 49.  Plaintiff further alleges that Defendants, directly, or through HS, transferred Plaintiff's trade secrets to PDA and have continued to use and possess Plaintiff's trade secrets without license or authorization to do so.  *Id.* ¶¶ 50, 52.  In light of the above, Plaintiff brings claims for misappropriation of trade secrets under the Federal Defend Trade Secrets Act (Count I), misappropriation of trade secrets under the Pennsylvania Uniform Trade Secrets Act (Count II), unfair competition (Count III), unjust enrichment (Count IV), and tortious interference with prospective contractual relations (Count V).

By way of procedural background, Plaintiff filed the Complaint on August 24, 2023.  ECF No. 1.  On November 17, 2023, Plaintiff filed a status report with the Court advising the Court of its efforts to serve Defendants, who are all foreign corporations and individuals.  ECF No. 19.  Plaintiff continued to file status reports with the Court as to its service efforts throughout 2024 and into 2025.

On October 3, 2024, Plaintiff filed an affidavit of service as to Stocker (ECF No. 26) as well as a request for the entry of default (ECF No. 27).  The Clerk entered default as to Stocker on

October 4, 2024.  ECF No. 28.  On October 6, 2024, Stocker filed a Motion to Vacate Entry of Default (ECF No. 31) as well as a Brief in Support (ECF No. 32).  On October 21, 2024, Plaintiff filed a Response in Opposition.  ECF No. 36.  On October 25, 2024, Stocker filed an Affidavit in support (ECF No. 37) and on October 28, 2025, Stocker filed a Reply (ECF No. 38).

On February 4, 2025, HS Group and Rormeser filed a Motion to Compel Arbitration (ECF No. 43) and a Brief in Support (ECF No. 44) as well as a Motion to Dismiss (ECF No. 46) and a Brief in Support (ECF No. 47).  On February 25, 2025, Plaintiff filed a Response in Opposition to the Motion to Compel Arbitration (ECF No. 57) and a Response in Opposition to the Motion to Dismiss (ECF No. 58).  On March 4, 2025, HS Group and Rormeser filed a Reply in Support of the Motion to Compel Arbitration (ECF No. 59) and a Reply in Support of the Motion to Dismiss (ECF No. 60).

On May 27, 2025, PDA filed a Motion to Dismiss (ECF No. 70) as well as a Motion to Compel Arbitration (ECF No. 71).  On May 29, 2025, Plaintiff filed a Response in Opposition to the Motion to Dismiss (ECF No. 75) and a Response in Opposition to the Motion to Compel Arbitration (ECF No. 76).

## II.    Legal Standard

### A.  Motion to Compel Arbitration

Depending on the circumstances, a motion to compel arbitration may be analyzed under either the Rule 12(b)(6) motion to dismiss standard or the Rule 56 motion for summary judgment standard.  *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 773–76 (3d Cir. 2013).  The Rule 12(b)(6) standard applies "[w]here the affirmative defense of arbitrability of claims is apparent on the face of a complaint (or ... documents relied upon in the complaint)."  *Id.* at 773–74 (internal quotations omitted).  The summary judgment standard, however, applies when either

(1) "the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity to establish on its face that the parties agreed to arbitrate," or (2) "the opposing party has come forth with reliable evidence that is more than a naked assertion ... that it did not intend to be bound by the arbitration agreement, even though on the face of the pleadings it appears that it did." *Id.* at 774 (quotations and citations omitted). If the reviewing court finds that the motion to compel arbitration must be analyzed under the summary judgment standard, "the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question." *Id.* at 776 (internal quotations omitted).

Here, the Complaint relies upon the License Agreement entered into between Plaintiff and Defendants and the License Agreement is attached to the Complaint. Further, Plaintiff has not submitted any evidence in support of its opposition to the Motion to Compel Arbitration and there are no genuine disputes of material fact. Therefore, the appropriate standard of review is the Rule 12(b)(6) Motion to Dismiss standard.

### B. Motion to Dismiss

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A

"formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The Supreme Court of the United States has explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

The United States Court of Appeals for the Third Circuit instructs that "a court reviewing the sufficiency of a complaint must take three steps." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). The Third Circuit explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." (citation and editorial marks omitted)). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

*Connelly*, 809 F.3d at 787. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (internal citations omitted).

In addition to reviewing the facts contained in the complaint, a court may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). When a document integral to or relied upon in the complaint is included, the court may also consider that document. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

Although a district court is not obligated to permit leave to amend before dismissing a complaint in a non-civil rights case, *Wolfington v. Reconstructive Orthopaedic Assocs. II P.C.*, 935 F.3d 187, 210 (3d Cir. 2019), courts generally grant leave to amend unless amendment of the complaint would be inequitable or futile. *See, e.g., Bachtell v. Gen. Mills, Inc.*, 422 F. Supp. 3d 900, 915 (M.D. Pa. Oct. 1, 2019) (citing *Phillips v. Allegheny Cty.*, 515 F.3d 224, 245 (3d Cir. 2008)).

## III.    Discussion

The first question before the Court is the order in which the pending motions should be decided. The Court will first rule on the Motion to Vacate Entry of Default filed by Stoker. Next, the Court will rule on HS Group, Rormeser, and PDA's Motions to Compel Arbitration before ruling on the Motions to Dismiss. The Third Circuit is clear that a district court should rule on a motion to compel arbitration before a motion to dismiss for failure to state a claim unless the motion to dismiss presents questions as to the Court's subject matter jurisdiction. *See Edmondson v, Lilliston Ford*, 593 F. App'x 108, 111-12 (3d Cir. 2014) (holding that the district court erred in dismissing a motion to compel arbitration as premature pending a ruling on a motion to dismiss because the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which

7

an arbitration agreement has been signed." However, a district court "is not precluded from making a threshold determination of subject matter jurisdiction prior to" ruling on a motion to compel arbitration. (citations omitted)); *Silfee v. Automatic Data Processing, Inc.*, 696 F. App'x 576, 577 (3d Cir. 2017) (holding that the district court "erroneously ruled on [the defendant's] motion to dismiss before resolving its motion to compel arbitration"). Here, given that Defendants' Motions to Dismiss do not challenge the Court's subject matter jurisdiction, the Court will rule on the Motions to Compel Arbitration before the Motions to Dismiss.

### A. Motion to Vacate Entry of Default

As detailed above, the Clerk entered default as to Stocker on October 4, 2024 and, on October 6, 2024, Stocker moved to vacate the entry of default. Rule 55 provides that "[t]he court may set aside an entry of default for good cause." Fed. R. Civ. P. 55(c). In determining whether good cause exists, the court should consider the following four factors:

> (1) whether lifting the default would prejudice the plaintiff; (2) whether the defendant has a prima facie meritorious defense; (3) whether the defaulting defendant's conduct is excusable or culpable; and (4) the effectiveness of alternative sanctions.

*Emcaso Ins. Co. v. Sambrick*, 834 F.2d 71, 73 (3d Cir. 1987). "A decision to set aside an entry of default pursuant to Fed. R. Civ. P. 55(c) 'is left primarily to the discretion of the district court.'" *Bailey v. United Airlines*, 279 F.3d 194, 204 (3d Cir. 2002). "Default is not favored and doubt should be resolved in favor of setting aside a default and reaching a decision on the merits." *99 Stores, Inc. v. Dynamic Distributors*, No. Civ. A. 97-3869, 1998 WL 24338, at *4 (E.D. Pa. Jan. 22, 1998).

Stocker presents two main arguments in support of his request that the Court set aside the clerk's entry of default: (1) the entry of default was invalid because Plaintiff failed to properly serve Stocker and (2) Stocker has shown good cause for vacating the entry of default. Concerning

8

the contention of improper service, Plaintiff claims that it properly served Stocker at his registered address in Argentina under the Hague Convention in compliance with Fed. R. Civ. P. 4(f)(1).  ECF No. 36 at 2-3.  However, Stocker claims that he does not reside in Argentina, the address at which Plaintiff alleges Stocker was served is his mother's address at which Stocker has not resided in over 30 years, and Stocker currently resides in Spain.  ECF No. 32 at 6.  The Court finds that resolution of the parties' arguments concerning the validity of service would be better suited for resolution on a dispositive motion.  Further, the Court finds that it need not resolve the issue of improper service to determine whether to vacate the entry of default because the Court may determine whether Stocker has shown good cause under Rule 55(c).  As such, the Court declines to address these arguments herein and will decide Stocker's Motion on Rule 55(c) grounds alone.

Turning to whether Stocker has shown good cause, Plaintiff argues that Rule 55(c) is not applicable to this case because Stocker was served under the Hague Convention.  ECF No. 36 at 5.  As such, Plaintiff argues that Article 15 of the Hague Convention applies and that, because Stocker was properly served, was aware of the lawsuit, and had adequate time to defend himself, Stocker's Motion should be denied.  *Id.* at 5-7.  Stocker argues that Rule 55(c) applies and that he has shown good cause.

The Court agrees with Stocker that Rule 55(c) is applicable.  Plaintiff has cited no support for its contention that Rule 55(c) is not applicable and numerous courts have applied the Rule 55(c) standard even when a defendant was served via the Hague Convention.[3]  *See Balestra v. Cloud With Me Ltd.*, Civil Action No. 18-0804, 2020 WL 13886412 (W.D. Pa. Nov. 30 2020) (analyzing a motion to vacate under Rule 55(c) when the defendant was properly served under the Hague

---

[3] The Court also questions the applicability of Article 15 when ruling on a motion to vacate.  In reviewing relevant case law, the Court notes that courts will look to both Rule 55 and Article 15 when determining whether to enter default judgment against a defendant.  However, Plaintiff has not directed the Court to, and the Court has not found, a case where a court relies solely on Article 15 to decide a motion to vacate.

Convention); *Friends of Barefoot College Int'l Inc. v. EMP-Bindi Int'l Ass'n*, Case No. 24-24434, 2026 WL 522874 (S.D. Fl. Feb. 14, 2026) (analyzing a motion to vacate under Rule 55(c) despite defendant's argument that it was not properly served under the Hague Convention); *Robinson v. Sanctuary Music*, 383 F. App'x 54 (2d Cir. 2010) (applying Rule 55(c) in a case where defendant was served under the Hague Convention).

Therefore, under Rule 55(c), the Court finds that Stocker has shown good cause. As to the first factor, prejudice to the Plaintiff, the Court finds that this factor weighs in favor of vacating the clerk's entry of default. Acknowledging the somewhat lengthy pendency of this case, Plaintiff's actions so far have included filing the Complaint, serving international defendants, requesting a clerk's entry of default as to one defendant, and responding to motions to dismiss and motions to compel arbitration by the other defendants. As such, this action is still in its infancy. The Rule 26(f) conference has not occurred in this matter and, as such, vacating default would not cause delays in discovery.

Similarly, the second factor, whether defendant has a meritorious defense, also weighs in favor of vacating default. Here, Stocker asserts the following defenses: no personal jurisdiction based on insufficient service of process; lack of specific personal jurisdiction; improper venue; statute of limitations; a valid arbitration clause; as well as other defenses concerning Plaintiff's ability to prove its claims. ECF No. 32 at 9-10. Here, because Stocker seeks only to vacate the entry of default, as opposed to default judgement, "courts within this circuit seem unwilling to deny the motion to set aside entry of default solely on the basis that no meritorious defense exists." *US Information Group LLC v. Date Blade LLC*, Civil Action No. 25-1844, 2025 WL 3640959, at *5 (D. N.J. Dec. 16, 2025) (collecting cases) (internal citations omitted). Therefore, at this stage

10

of the proceedings, Stocker has met the showing required for the meritorious defense factor and this factor weighs in favor of setting aside default.

Next, the Court finds that the third factor, the culpable conduct on the part of the defendant, weights in favor of vacating the entry of default. "Culpable conduct is more than mere negligence; it is willful, intentional, reckless or bad faith behavior." *Thurston Law Offices LLC v. Rue*, Civil No. 24-1153, 2025 WL 2603452, at *2 (D. N.J. Sept. 9, 2025) (internal citations omitted). Stocker argues that his failure to appear is excused by Plaintiff's failure to properly serve him. ECF No. 32 at 10-11. While not specifically addressing this factor, Plaintiff argues that before and after completing service, Plaintiff's counsel engaged in communications with counsel for Stocker showing that Stocker was aware of the pending lawsuit and failed to respond for nearly ten months following service until the entry of default. ECF No. 36 at 6.

Here, there is no evidence that Stocker acted in bad faith or in any way willfully, intentionally, or recklessly avoided service or avoided appearing in this matter. The email communications submitted by Plaintiff merely detail conversations between Plaintiff and Stocker himself attempting to resolve this matter as well as conversations between counsel concerning deadlines, in which Stocker's counsel asked for proof of service when it was available. These communications do not show any willful, intentional, or reckless conduct or bad faith. Further, even assuming, for purposes of this analysis only, that Stocker was served on December 9, 2023 and did not appear in this action until October 6, 2024, there is still no basis to find culpable conduct on behalf of Stocker. Proof of service was not filed with the Court until October 3, 2024 and Plaintiff did not move for default until October 3, 2024. As such, Stocker moved to vacate default two days after default was entered by the Clerk.

11

The first three factors warrant setting aside the entry of default, and the Court is without specific information respecting the fourth factor, alternative sanctions, as neither party has addressed the issue in their briefing.  Therefore, for the reasons set forth above, Stocker has shown good cause, and his Motion to Vacate Entry of Default is granted.  The Clerk of Court is directed to vacate the entry of default against Stocker (ECF No. 28).

### B.  Motions to Compel Arbitration[4]

Defendants HS Group, Rormeser, and PDA seek to compel arbitration under the Licensing Agreement entered into between Plaintiff's predecessor and Stocker and Lamer, individually and acting on behalf of HS Group's predecessor, HS.  Plaintiff raises arguments in opposition to Defendant's Motion to Compel arguing both that the arbitration agreement does not apply and that, even if it does apply, it does not cover the circumstances of this dispute.

First, Plaintiff argues that Defendants were not signatories to the Licensing Agreement and cannot enforce the arbitration agreement.  ECF No. 57 at 3.  In response, Defendants argue that arbitration is appropriate as to HS Group because its predecessor, HS, entered into the Agreement and that arbitration is appropriate as to non-signatories HS, Rormeser, and PDA under the theory of equitable estoppel.  ECF No. 44 at 9-10.  As to HS Group, Plaintiff alleges that its predecessor entered into the Licensing Agreement with HS, the predecessor of HS Group.  Compl. ¶¶ 29-30. The Court agrees with Defendants that a successor to a signatory may enforce an arbitration agreement.  *See Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1297 (3d Cir. 1996) (finding that a successor to a signatory could compel arbitration).  However, the Court also recognizes that Defendants asserted this basis for enforceability for the first time in their Reply Brief, *see* ECF

---

[4] PDA's Motion to Compel Arbitration incorporates the arguments raised in HS Group and Rormeser's Motion to Compel Arbitration.  As such, the Court will only refer to arguments raised within HS Group and Rormeser's Motion.

No. 59 at 3, and therefore, Plaintiff did not have the opportunity to respond to this argument. Even so, based on the subsequent analysis discussed below, the Court would find for additional reasons that HS Group may enforce the arbitration agreement.

Specifically, the Court finds that Defendants HS Group, Rormeser, and PDA may enforce the arbitration agreement under the theory of equitable estoppel. As explained by the Third Circuit, non-signatories may be bound by an arbitration agreement when "it is bound under traditional principles of contract and agency law to be akin to a signatory of the underlying agreement." *Invista S.A.R.L. v. Rhodia*, S.A., 625 F.3d 75, 84 (3d Cir. 2010) (internal citations omitted). Specifically, under Pennsylvania law, a non-signatory may be bound under the following theories: "(1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel."[5] *Id.* (internal citations omitted).

The standard for equitable estoppel varies depending on what party is seeking to enforce the agreement. When a signatory is seeking to bind a non-signatory to an arbitration clause, the non-signatory may be bound when it has "embrace[d] the agreement and directly benefit[ed] from it." *O'Hanlon v. Uber Technologies, Inc.*, 990 F.3d 757, 765 (3d Cir. 2021). However, when a non-signatory seeks to enforce an arbitration agreement against a signatory, "the question is whether 'there is an obvious and close nexus between the non-signatories and the contract or the contracting parties,' often measured in terms of 'inextricabl[e] entwine[ment]' of the claims with the contract." *Id.* at 767, n.6 (quoting *Elwyn v. DeLuca*, 48 A.3d 457, 463 (Pa. Super. Ct. 2012))

---

[5] The Court must look to state law when determining whether a non-signatory may enforce an arbitration agreement. *White v Sunoco, Inc.*, 870 F.3d 257, 262 (3d Cir. 2017). The parties are in agreement that Pennsylvania law applies and the Court notes that the Licensing Agreement contains a Pennsylvania choice of law provision.

13

(alternations in original); *Noye v. Johnson & Johnson Services, Inc.*, 765 F. App'x 742, 746 (3d Cir. 2019). This later test is often referred to as alternative equitable estoppel.[6]

Here, the Court is presented with a situation where a non-signatory is seeking to enforce an arbitration agreement against a signatory and must, therefore, apply the second test. Applying the relevant equitable estoppel test, the Court finds that the non-signatory Defendants may enforce the arbitration agreement. To begin, the Court agrees with Defendants that the Complaint contains substantial allegations that Plaintiff's claims against Defendants are substantially intertwined with the Licensing Agreement. Specifically, Plaintiff alleges that PDA is owned by HS Group, the successor to HS, and that Rormeser is a co-founder of PDA. Compl. ¶¶ 9, 12, 30. Further, Plaintiff alleges that its predecessor terminated the Licensing Agreement with HS, "thereby dissolving HS's, and its successors', right to market, sell, or use [Plaintiff's] Trade Secrets[,]" but that notwithstanding this termination, "Lammers, Stocker, and Rormeser founded and began doing business as PDA" and continued to possess Plaintiff's Trade Secrets "[r]ather than ceasing to use [them], as required by the Licensing Agreement." *Id.* ¶¶ 47, 49, 51. Lastly, Plaintiff has alleged that HS Group, Rormesor, and PDA, non-signatories to the Licensing Agreement, engaged in collective wrongdoing with signatories to the Licensing Agreement, i.e., Lammers and Stocker. As such, Plaintiff has raised allegations as to Defendants collectively and this type of collective

---

[6] Based on the Court's review of Defendants' arguments, Defendants are solely seeking to compel arbitration under this "alternative equitable estoppel" theory. Plaintiff argues that Defendants have asserted to compel arbitration under the estoppel and "close nexus" theories. ECF No. 57 at 4. However, the "close nexus" test falls under the equitable estoppel theory because, as detailed above, there are two distinct ways to assert equitable estoppel based on whether a non-signatory or a signatory is seeking to enforce the arbitration provision. As such, the Court does not find that these are two distinct theories and will only address whether the equitable estoppel theory applies under the close nexus test. This is supported by Defendants' argument that the standard for equitable estoppel varies depending on whether a non-signatory or signatory is seeking to enforce arbitration and asserting that, in this case, the close nexus test applies. ECF No. 43 at 3-6. Still Defendants argue that if the Court were to apply the standard for when a signatory seeks to enforce an arbitration agreement, i.e., whether the non-signatory has benefited, there are allegations in the Complaint to support such a finding. *Id.* The Court will not address these arguments as the law is clear that only the close nexus test would apply in this case.

wrongdoing may support a theory of equitable estoppel.  *See Colon v. Conchetta, Inc.*, Civil Action No. 17-0959, 2017 WL 2572517, at *6 (E.D. Pa. June 14, 2017).  These allegations are enough for the Court to find under the alternative equitable estoppel theory that the non-signatory Defendants may enforce the arbitration agreement.

However, that does not end the analysis as the Court must also address Plaintiff's argument that Defendants are not a party to the arbitration provision because the License Agreement limits the scope of arbitration to claims between the parties.  ECF No. 57 at 8-9.  The relevant portion of the arbitration provision provides:

> Except as provided herein, *the Parties* irrevocably agree that all disputes, controversies or claims *between them* arising in connection with or in occasion of this Agreement, including without limitation any dispute regarding its validity or termination, or the performance or breach thereof, to the extent no (sic) resolved by negotiations, shall be finally settled by arbitration administered by the International Chamber of Commerce's International Court of Arbitration (the "ICE").

Compl., Ex. A, ¶ 10.13 (emphasis added).  Plaintiff cites to no case law in support of its assertion that the theory of alternative equitable estoppel requires the Court to determine (1) whether there is a close nexus *and* (2) whether the arbitration agreement limits the scope to only claims arising between the parties.  Moreover, the Court finds little to no support for Plaintiff's argument.

The Pennsylvania Superior Court set forth the relevant standard for alternative equitable estoppel in *Dodds v. Pulte Home Corp.*, 909 A.2d 348 (Pa. Super. Ct. 2006), requiring that there be an "obvious and close nexus between the non-signatories and the contract or the contracting party."  While Pennsylvania's Supreme Court has not embraced this standard, the Third Circuit has predicted that Pennsylvania's Supreme Court would embrace the *Dodds* test in light of the Pennsylvania intermediate appellate courts having firmly embraced *Dodds*.  *Noye*, 765 F. App'x at 746.  Following the decision in *Dodds*, the Pennsylvania Superior Court issues its decision in *Elwyn v. DeLuca*, 48 A.3d 457 (Pa. Super. Ct. 2012).  In *Elwyn*, the Superior Court affirmed a

15

denial of a motion to compel arbitration finding that, unlike in *Dodds*, the arbitration clause in *Elwyn* limited arbitration to disputes between the parties to the contract and, as such, the appellant, who was not a party to the contract had no right to compel arbitration.  48 A.3d at 463.  Further, the *Elwyn* court found that the appellee's claims against the appellant were not inextricably entwined with the contract.  *Id.*

As such, the Court recognizes that in *Elwyn*, the Superior Court declined to compel arbitration, in part, because the arbitration provision at issue included language limiting the dispute between parties to the contract.  However, despite this finding, the *Elwyn* court still went on to analyze whether there was a close nexus between the non-signatory and the contract or contracting party.  Further, courts within this Circuit have found that a non-signatory may either enforce, or be compelled to comply with, an arbitration provision under the theory of equitable estoppel, even in situations where the arbitration provision includes language that it is limited to disputes between the parties.  *See Caparra v. Maggiano's Inc.*, Civil Action No. 14-05722, 2015 WL 5144030 (E.D. Pa. Sept. 1, 2015) (enforcing arbitration clause against non-signatories where arbitration clause stated that it applied to "all disputes that arise between [the plaintiff] and [one of the defendants]"); *Medversant Technologies, LLC v. Leverage Health Solutions, LLC*, 114 F. Supp. 3d 290 (E.D. Pa. 2015) (same); *Noye*, 765 F. App'x 742 (3d Cir. 2019) (finding that there was a close nexus between non-signatory Johnson & Johnson and the contracting parties and that, therefore, alternative equitable estoppel applied even where the arbitration agreement compelled arbitration "for any 'Covered Claims' that arise between [plaintiff] and [defendant], or its related and affiliated companies" and that the only question remaining for the district court was whether plaintiff's claim fell within the scope of the arbitration agreement).

Because there is little authority supporting Plaintiff's argument that the Court should decline to compel arbitration as to non-signatories to a contract solely when the arbitration agreement states that it is limited to disputes between the parties, and because courts within this circuit have compelled arbitration as to non-signatories despite similar language in arbitration provisions, this Court will reject Plaintiff's argument. Under relevant authority, a non-signatory may enforce an arbitration clause and the Court's ruling here today aligns with the reasoning of the court in *Dodds* that a plaintiff "should not be able to avoid the requirement to arbitrate by a non-signatory when the non-signatory *wants* to arbitrate." *Dodds*, 909 A.2d at 352 (emphasis in original). Here, the non-signatories want to arbitrate and there is an obvious and close nexus between the non-signatory Defendants and the contract and contracting parties. Additionally, Plaintiff's Complaint refers to the Defendants collectively and accuses them of the same conduct as to each count making the interests of the non-signatory Defendants the same as the signatory Defendant, further reflecting a close nexus between the parties. As such, the Court finds that HS Group, Rormesor, and PDA may compel arbitration as non-signatories.

Next, Plaintiff argues generally that the Licensing Agreement terminated prior to Defendants' misappropriation of trade secrets and, therefore, Plaintiff is not seeking relief based on the Agreement and Defendants cannot enforce the arbitration agreement. ECF No. 57 at 10. Defendants argue that this argument is inapplicable because the Agreement contains provisions that survive its termination. ECF No. 59 at 2. Neither party has substantially addressed this issue outside of the conclusory arguments summarized herein.

Even so, the standard for determining whether an arbitration clause survives a terminated agreement is straightforward. The Supreme Court has held that arbitration clauses may survive

the expiration of a contract to enforce duties arising under the contract.[7] *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 207-08 (1991) (finding that contractual obligations generally cease upon termination of an agreement but that arbitration provisions may survive to enforce duties arising under the agreement).  Specifically, a post-expiration claim arises under the contract when "it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or, where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Id.* at 206.  An arbitration agreement may survive the expiration of a contract with respect to certain claims but not others.  *Basketball Marketing Co., Inc. v. Urbanworks Entertainment*, No. 04-3179, 2004 WL 2590506 (E.D. Pa. Nov. 10, 2004).

Here, Plaintiff asserts claims for misappropriation of trade secrets under federal and state law, unfair competition, unjust enrichment, and tortious interference with prospective contractual relations.   In sum, all of Plaintiff's claims arise out of Defendants use of Plaintiff's trade secrets.  Generally, when considering a plaintiff's intellectual property claims, courts have found that an arbitration agreement does not survive the expiration of a contract.  *See Basketball Marketing Co.*, 2004 WL 2590506, at *5-6 (finding that the arbitration clause did not survive as to plaintiff's intellectual property claims because (1) the claims involved facts arising after the termination of the agreement; (2) the claims did not seek to vindicate rights under the agreement because the agreement was clear that plaintiff owned the rights to the intellectual property before, during, and

---

[7] The Court recognizes that the Supreme Court's decision in *Litton* concerned the survival of an arbitration clause in an expired collective bargaining agreement and that the policies in favor of permitting arbitration under a collective bargaining agreement may not support the survival of an arbitration clause in a commercial contract.  That said, courts within this Circuit have applied the *Litton* standard to commercial contracts finding that the "logic expressed in *Litton* [is] applicable to general contracts." *Basketball Marketing Co., Inc. v. Urbanworks Entertainment*, No. 04-3179, 2004 WL 2590506, at * 4-5 (E.D. Pa. Nov. 10, 2004); *Hinnant v. American Ingenuity, LLC*, 554 F. Supp. 2d. 576 (E.D. Pa. 2008).

after the agreement, and (3) the intellectual property claims did not involve a right that survived the termination of the agreement); *see also Hinnant*, 554 F. Supp. 2d at 584-85 (same).

It is clear that under the first *Litton* prong, Plaintiff's claims are not arbitrable because they do not involve facts and occurrences that arose before the expiration of the Agreement. Plaintiff alleges that the Agreement terminated on April 8, 2008 and that Defendants' use of Plaintiff's trade secrets did not occur until after the termination of the Agreement. Compl. ¶¶ 47-49.

Turning to the second prong, the Court does not find that the post-expiration action infringes a right that accrued or vested under the agreement. Here, unlike in *Basketball Marketing Co.*, the Agreement at issue does not include language clarifying that Plaintiff's trade secrets belonged to plaintiff before, during, and after the Agreement. *See Basketball Marketing, Co.*, 2004 WL 2590506, at *6 ("Instead, as the agreement confirms, plaintiff owned the rights to the intellectual property before, during, and after the agreement."). That said, the Court acknowledges that a party generally owns the rights to its trade secrets beyond a commercial contract. Further, like in *Basketball Marketing Co.*, the Defendants have not argued that the Agreement still exists or that the Agreement allowed Defendants to continue the use of Plaintiff's trade secrets. *See Id.* As such, Defendants have "not presented a link between defendant[s'] alleged misuse of plaintiff['s] intellectual property and the rights guaranteed by the agreement[,]" meaning the second prong is not satisfied. *Id.*

The Court does find, however, that the third *Litton* prong is satisfied. Here, as argued by Defendants, Plaintiff's claims involve a right that survives termination of the Agreement. Specifically, the Agreement provides that:

> [Plaintiff's predecessor] grants [HS Groups' predecessor] the right to use the "Trade Secrets" in connection with the operation of its business, and for no other purpose, during the term of this Agreement. [HS Groups' predecessor] agree (sic)

19

to preserve the "Trade Secrets" as confidential and not use them for any other purpose or disclose them to others during the term of this Agreement or *thereafter*.

Compl., Ex. A, ¶ 7.11 (emphasis added).  This language clearly indicates that the central issue of Plaintiff's allegations as to all counts, that Defendants improperly used Plaintiff's trade secrets, was a violation of an obligation that survived the termination of the Agreement.  *Cf. Basketball Marketing Co.*, 2004 WL 2590506, at * 5-6 (finding that the arbitration clause did not survive as to the plaintiff's intellectual property claims because "[u]nlike Count I, which involves in part the alleged breach of auditing obligations that expressly survived the termination of the agreement, the central issues of Counts II through VIII of the complaint is whether the defendant was permitted to use, and in fact used, plaintiffs' intellectual property after the termination of the agreement" when the "contractual right to use plaintiffs' intellectual property . . . terminated with the agreement."); *cf. Hinnat*, 554 F. Supp. 2d at 584 (finding that arbitration did not survive as to the plaintiff's intellectual property claims because "the rights at issue did not survive termination of the agreement because the 'contractual right to use plaintiff's intellectual property to distribute certain products terminated with the agreement.'" (quoting *Baskebtall Marketing Co.*, 2004 WL 2590506, at *6)).  As such, Defendants right to use Plaintiff's trade secrets ended with the termination of the Agreement but their obligation not to use Plaintiff's trade secrets continued thereafter.  Because of this, the third *Litton* prong is satisfied, and the Court finds that the arbitration agreement survives as to each of Plaintiff's claims because each claim involves a right that survives the Agreement.  Further, there is nothing in the arbitration agreement itself that limits it in scope to disputes that arose before the termination of the Agreement.

Third, Plaintiff argues that the claims set forth in the Complaint do not fall within the scope of the arbitration provision.  Plaintiff asserts that the arbitration provision limits the scope to disputes between the parties related directly to the License Agreement and as such, the disputes at

issue here are not between the parties to the agreement and Plaintiff's Complaint does not raise claims related to the License Agreement.[8]  ECF No. 57 at 8-9.  "In determining whether the particular dispute falls within a valid arbitration agreement's scope, 'there is a presumption of arbitrability[:] an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"  *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009) (alterations in original).  Further, when determining "'whether a particular dispute falls within the scope of an arbitration clause, a court looks not to the labels or legal theories attached to the claims . . . but rather it must 'focus[] on the factual underpinnings of the claim.'"  *Medversant Tech., LLC v. Leverage Health Solutions*, LLC, 114 F. Supp. 3d 290, 297 (E.D. Pa. 2015) (quoting *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 173 (3d Cir. 2014)).

As detailed above, the relevant portion of the arbitration provision provides:

Except as provided herein, the Parties irrevocably agree that all disputes, controversies or claims between them arising in connection with or in occasion of this Agreement, including without limitation any dispute regarding its validity or termination, or the performance or breach thereof, to the extent no (sic) resolved by negotiations, shall be finally settled by arbitration administered by the International Chamber of Commerce's International Court of Arbitration (the "ICE").

Compl., Ex. A, ¶ 10.13.  Courts within this Circuit have held that arbitration provisions containing similar language are broad and unambiguous.  *See Aluminium Bahrain B.S.C. v. Dahdaleh*, 17 F. Supp. 3d 461, 475 (W.D. Pa. 2014) (finding that the language "in connection with" is "broad and unambiguous, encompassing any dispute that has a 'logical or casual connection' to the . . . contracts" (quoting *John Wyeth & Bro. Ltd. V. CIGNA Intern. Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997)); *see also Hinnant*, 554 F. Supp. 2d at 587 (finding language requiring arbitration for "all

---

[8] The Court has already found that Defendants may enforce the arbitration agreement despite being non-signatories to the Agreement.  Therefore, the Court will not address Plaintiff's repeated argument that Defendants are not parties to the Agreement.

disputes in connection with this contract" to be broad).  Plaintiff's attempt to limit the scope of this arbitration clause by arguing it applies only to disputes related directly to the Agreement, such as its validity, termination, performance, or breach are unavailing.  *See* ECF No. 57 at 8.  As detailed, courts within this Circuit have found that similar arbitration agreements are broad in scope, and the specific examples contained within the arbitration provision do not limit its application, they merely provide a non-exhaustive list of the types of disputes that may arise.

Here, Plaintiff asserts claims for misappropriation of trade secrets under federal and state law, unfair competition, unjust enrichment, and tortious interference with prospective contractual relations.  The Court finds that Plaintiff's misappropriation of trade secrets claims clearly fall within the scope of the arbitration agreement because the Agreement governed the transfer and entrustment of Plaintiff's trade secrets to Defendants, and their predecessors, and the Agreement specifically provides that Defendants shall not use or disclose these trade secrets during the term of the Agreement or thereafter.  Compl., Ex. A, ¶ 7.11.  Further, Plaintiff's allegations as to the misappropriation of trade secrets claims relate to the performance of the Agreement.  Compl. ¶¶ 74, 78, 91, 95 (alleging, in sum, that Defendants were provided Plaintiff's trade secrets under the Licensing Agreement, and then, Defendants misappropriated these trade secrets).

The same is true for Plaintiff's claims for unfair competition and unjust enrichment. Plaintiff's allegations touch the Agreement at issue and therefore fall within the broad scope of the arbitration agreement.  Specifically, as to its unfair competition claim, Plaintiff alleges that Defendants' misappropriation of trade secrets has created unfair competition.  Compl. ¶¶ 100-01. Further, as to its unjust enrichment claim, Plaintiff alleges that Defendants received the benefit of trade secrets and then used those trade secrets without the necessary license or authorization and

were unjustly enriched as a result. *Id.* ¶¶ 106-07. As such, these allegations require reference to the Agreement at issue and fall within the scope of the arbitration agreement.

Lastly, the same is also true as to Plaintiff's tortious interference claim. Plaintiff alleges that Defendants have prevented Plaintiff's "formation of business relationships and license agreements" through their "unlicensed and unauthorized use of [Plaintiff's] Trade Secrets." Compl. ¶ 116. Such allegations render this claim as one arising with respect to this Agreement. While Plaintiff relies on *Collins & Aikman Products Co. v. Building Systems, Inc.*, 58 F.3d 16 (2d Cir. 1995) for the proposition that its tortious interference claim, and all other claims, is not within the scope of the arbitration clause, *see* ECF No. 57 at 9-10, the *Collins* court's decision is distinguishable. *Collins* involved two separate agreements, a 1977 sales agreement and an unrelated 1988 confidentiality agreement. 58 F.3d at 18. The 1977 agreement contained an arbitration clause but the 1988 agreement, which involved negotiations for the defendant to acquire the plaintiff's business, contained no arbitration clause. *Id.* at 18-19. The Second Circuit found that the tortious interference claim was not arbitrable because it did not involve allegations of the 1977 agreement but instead arose under the 1988 agreement. *Id.* at 22. Here, unlike in *Collins*, there is only one Agreement at issue, that contains an arbitration provision, and the alleged conduct of Defendants arises under said Agreement.

Therefore, for the reasons discussed above, HS Group, Rormeser, and PDA's Motions to Compel Arbitration are granted, and this case is stayed as to HS Group, Rormeser, and PDA pending the outcome of arbitration.[9] The Court has addressed all of Plaintiff's arguments and has

---

[9] The Court perceives that Stocker may similarly move to dismiss and/or compel arbitration in light of the arguments made in support of his Motion to Vacate Entry of Default. The Court will leave it to the parties to discuss the scheduling of arbitration including whether the parties wish to proceed to arbitration immediately or wait for the Court's ruling as to any motions filed by Stocker.

found that a valid arbitration agreement exists and that this dispute falls within the scope of that agreement.

### C. Motions to Dismiss

Because the Court has granted HS Group, Rormeser, and PDA's Motions to Compel Arbitration and stayed this action as to those Defendants, the Court will decline to rule on the pending Motions to Dismiss, at this time.  Therefore, HS Group, Rormeser, and PDA's Motions to Dismiss are dismissed, without prejudice.

### IV.    Conclusion

For the reasons discussed above, the Court will grant Stocker's Motion to Vacate Entry of Default, grant HS Group, Rormeser, and PDA's Motions to Compel Arbitration, and dismiss, without prejudice, HS Group, Rormeser, and PDA's Motions to Dismiss.  An appropriate Order of Court follows.

BY THE COURT:

*/s/Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: March 19, 2026

cc: All counsel of record